

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LOUISE JONES, | ) | |
| | ) | |
| Plaintiff, | ) | No. 05 C 1584 |
| | ) | |
| v. | ) | |
| | ) | |
| M & R PRINTING EQUIPMENT, INC. | ) | Magistrate Judge Arlander Keys |
| GROUP LONG TERM DISABILITY | ) | |
| INSURANCE PLAN, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Louise Jones worked for M&R Printing Equipment, Inc. from September of 2000 to August 7, 2002, when she was fired for excessive absenteeism. After being fired, Ms. Jones filed a claim for long-term disability benefits under M&R's employee benefit plan. UnumProvident, the administrator of M&R's plan, denied the claim initially and on appeal. Ms. Jones then filed this lawsuit, seeking judicial review of that denial and an award of benefits. The case is before the Court on cross-motions for summary judgment.

### Background & Procedural History

Louise Jones began working as a senior buyer for M&R Printing Equipment, Inc. on September 18, 2000. Her job required her to negotiate and maintain contracts, run daily plant acquisitions, and handle data entry, among other tasks; she was

expected to work five eight-hour days per week.  As a benefit of her employment with M&R, Ms. Jones was allowed to participate in the company's employee welfare benefit plan, which included short-term and long-term disability insurance coverage under policies issued by the Paul Revere Life Insurance Company of America and its parent, UnumProvident.  Ms. Jones enrolled in the plan effective January 1, 2001.

According to the records submitted in support of the parties' summary judgment motions, Ms. Jones was under the care of a cardiologist as early as 2001.  UnumProvident's claim file includes results from an echocardiogram undertaken on February 22, 2001, showing that, as of that date, Ms. Jones had "mild aortic sclerosis without stenosis" and "moderate aortic regurgitation with mild aortic stenosis."  Claim File, p. PRLCL00093 (included in Exhibit A to M&R's Appendix of Exhibits in Support of Summary Judgment).

The medical records further show that, on January 10, 2002, Ms. Jones saw a cardiologist and complained of "increased fatigue" over the "past several months," "increasing shortness of breath, particularly with walking up stairs," and "intermittent palpitations."  See Claim File, p. PRLCL00087.  A history of Lupus was also noted.  Id.  On February 5, 2002, she returned to the cardiologist for a follow-up visit.  According to the

2

doctor's notes, Ms. Jones reported feeling less short of breath and no further palpitations, but she also reported that there was "not much change" in her level of fatigue. *Id.*, p. PRLCL00088. The cardiologist assessed her as having aortic insufficiency and Lupus. *Id.* The cardiologist's notes show that an echocardiogram was essentially normal, but that she was concerned about Ms. Jones' dyspnea (shortness of breath) on exertion, especially given that she had cardiac risk factors (including the fact that she smoked); the doctor's notes indicate that she wanted to perform a stress test before making further recommendations. *Id.*, p. PRLCL00089.

Ms. Jones apparently did not see her cardiologist again until August 6, 2002. But, between her appointment on February 5, and her appointment on August 6, the records show that Ms. Jones was hardly idle on the medical front: she did, in fact, get a stress test - the results of which were normal; she also began seeing a rheumatologist, Dr. Elena Gogoneata, and she underwent a battery of allergy tests. *See* Claim File, pp. PRLCL00011, PRLCL00140-41, PRLCL00147.

At her next cardiologist appointment on August 6, 2002, she reported that she had seen two new rheumatologists in the months since her last appointment and was "quite frustrated with her fatigue." *See* Claim File, p. PRLCL00098. The cardiologist's

3

notes indicate that Ms. Jones also had fibromyalgia, which was causing her to experience constant muscle aches and joint pain; she reported that she was considering going to the Mayo Clinic for a workup. *Id.* The cardiologist also noted the April stress test and the normal findings therefrom. *Id.* The doctor assessed Ms. Jones as having aortic insufficiency, murmur, Lupus and chronic fatigue/malaise, and recommended that she continue her aortic regurgitation medication, as well as her other medications, and return for another follow-up "in six months or sooner if clinical status changes." *Id.* She also recommended a "[p]ossible workup at Mayo Clinic for her continued symptomatic lupus/fibromyalgia." *Id.*

On this last score, the claim file contains a "To Whom It May Concern" letter, written by Dr. William Nijm, Ms. Jones' primary care physician, on April 9, 2002, indicating that Ms. Jones had asked to be evaluated at the Mayo Clinic "because of controversy and vagueness in her present diagnosis." Claim File, p. PRLCL00097. According to that letter, Ms. Jones "has been complaining of constant lethargy and generalized malaise"; she "has a lot of joint complaints especially of the hip but an MRI of the hip did not show much pathology"; she has recurrent back pain and knee pain; she has "sclerosis of the aortic valve with moderate to severe regurgitation but no stenosis"; and she has

4

"marked environmental allergies." *Id.*

Despite the medical issues noted in the file, Ms. Jones continued to hold down her full-time job with M&R. It is undisputed, however, that, during the period from December 2001 through August 7, 2002, Ms. Jones missed a total of 22 days of work.

On August 7, 2002, M&R fired Ms. Jones for what it deemed to be excessive absenteeism. Following her termination, on April 14, 2003, Ms. Jones filed a Disability Claim form seeking Long Term Disability benefits. *See* Claim File, pp. PRLCL00018-19 (attached as Exhibit A to M&R's Appendix of Exhibits). On that form, she indicated that she suffered from lupus, which causes her to experience severe joint pain, exhaustion and aortic valve insufficiency, and from fibromyalgia, which causes her to experience joint pain, exhaustion and sleeplessness. *Id.*, p. PRLCL00018. She indicated on the form that her condition rendered her unable to work as of August 2002. *Id.*

On June 25, 2003, UnumProvident wrote to Ms. Jones to advise her that it was denying her claim for "short term disability benefits." *See* Claim File, p. PRLCL00031. Nothing in the claim file explains why UnumProvident processed Ms. Jones' claim as one for short-term benefits, when her claim form seeks long-term

benefits.[1] But, in any event, UnumProvident denied the claim because it determined that Ms. Jones' coverage ended on August 7, 2002, the day her employment with M&R was terminated, and that her disability date was May 5, 2003, "the first date of treatment after your last day worked." Id.

Ms. Jones appealed the decision to deny benefits. On October 17, 2003, UnumProvident wrote to Ms. Jones to advise her that it had upheld the decision to deny "short term disability benefits." See Claim File, p. PRLCL00069. This time, however, UnumProvident denied the claim because Ms. Jones continued to work until August 7, 2002 and because she was able to perform all the important duties of her job up until that time. Thus, according to UnumProvident, she did not meet the plan's definition of disability – and was therefore not eligible for benefits – until after her coverage was terminated. Id.

On March 17, 2005, Ms. Jones filed this lawsuit. She originally named the Paul Revere Life Insurance Company and UnumProvident as defendants, and later amended her complaint to name M&R's Group Long Term Disability Insurance Plan. In her

---

[1]And, indeed, UnumProvident's own documents create confusion as to whether it processed her claim as one for short-term or long-term disability benefits. As noted, the letters to Ms. Jones referenced a claim for short-term benefits. But other documents, including a letter to M&R requesting information about the reasons for Ms. Jones' termination, reference "LTD benefits," see Claim file, p. PRLCL00049, which the Court takes to mean long-term disability benefits.

complaint, she seeks an award of disability income benefits pursuant to the long-term insurance policy (policy number 89267) administered under M&R's employee benefit plan. The parties consented to proceed before a United States Magistrate Judge, and the case was reassigned to this Court on April 27, 2005. The case is now before the Court on the parties' cross-motions for summary judgment.[2]

## Discussion

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). At this stage, the Court does not weigh evidence or determine the truth of the matters asserted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court views all evidence and draws all inferences in favor of the non-moving party, and may enter summary judgment only if the record as a whole establishes that no reasonable jury could find for the non-

---

[2]As a preliminary matter, the Court notes that M&R has objected to Ms. Jones' Statement of Additional Facts; M&R asks the Court to strike or disregard the statement because the facts contained therein are not "additional," but are merely a recitation of the facts already submitted in her original statement of acts. Though it makes no practical difference, M&R is correct and the Court will, therefore, strike the statement.

7

moving party. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

Before addressing the substance of the claims, the Court must first consider the standard of review to be applied. The Seventh Circuit has held that, when an ERISA plan contains certain "safe harbor" language, a Court reviewing a decision to deny benefits under that plan must defer to the Administrator and may overturn that denial only if it was "arbitrary and capricious." *See, e.g., Herzberger v. Standard Insurance Company*, 205 F.3d 327, 331-32 (7th Cir. 2000). The key point is that, to rebut the presumption of plenary review, a plan must "indicate[] with the requisite if minimum clarity that a discretionary determination is envisaged"; plan documents that merely state that the Administrator will determine eligibility do not satisfy this test. *Id. See also Davis v. Unum Life Insurance Company of America*, 444 F.3d 569, 575 (7th Cir. 2006) (When the terms of an employee benefit plan vest the plan administrator with broad discretion to interpret the plan and to determine benefit eligibility, judicial review of the administrator's decision to deny benefits is limited to the arbitrary and capricious standard.).

The Summary Plan Description (SPD) for M&R's group benefit plan states that "The Paul Revere Life Insurance Company has

8

final decision-making authority to determine eligibility for benefits and to interpret its Policy as may be necessary in order to make claims determination." *See* Amended Complaint, Exhibit A, p. CD8FACE. The SPD also states:

> The Paul Revere is the Claims Administrator for benefits contained in the Group Policy it has issued to your employer. As Claims Administrator, the Paul Revere will make all decisions regarding eligibility for benefits and benefit determinations and will do so in accordance with the terms and conditions of the Group Policy. The Claims Administrator has full, final, complete, conclusive, and exclusive discretion to determine eligibility for coverage and benefits under the Group Policy, to determine the amount of any benefits payable under the Group Policy, and to construe and interpret the terms and conditions of the Group Policy and all related documents.
>
> Any decision by the Claims Administrator shall be final and binding on all parties and must be upheld in a court of law unless a participant, beneficiary or other party proves that the decision is arbitrary and capricious and there is no rational basis for the decision.

SPD, p. ERISA-1 (attached as Exhibit A to the Amended Complaint and as Exhibit C to M&R's Appendix of Exhibits in Support of Summary Judgment).

This language does not mirror the "safe harbor" language commended by the Seventh Circuit in *Herzberger*. And so the question is whether it indicates that the subjective intent of the Administrator will come into play. Although this is a close question, the Court finds that the last paragraph quoted above

9

tips the scale in favor of deferential review. The SPD does expressly state that the Administrator's decision is final and subject to, at most, a deferential judicial review.

Significantly, Ms. Jones has not pressed the argument that the Court's review should be plenary, which serves to buttress the notion that she had notice that any review here would be deferential. The Court will, therefore, apply the deferential, arbitrary and capricious standard of review.

Having determined the appropriate standard of review, the Court turns to the merits of the parties' arguments. Ms. Jones argues that she is entitled to summary judgment because the Plan's decision to deny her long-term disability benefits was, as a matter of law, arbitrary and capricious. M&R, on the other hand, argues that it is entitled to summary judgment because the decision to deny benefits was reasonable and permissible; more specifically, M&R argues, Ms. Jones failed to establish that she met the Plan's definition of "total disability" and was, therefore, under the plain language of the plan, not entitled to benefits.

Importantly, under the "arbitrary and capricious" standard, the Court's job is not to determine whether the administrator's decision was *correct*, but only whether it was reasonable. *Davis*, at 576. Under this standard, the Court must uphold the Plan's

decision to deny benefits "so long as that decision has 'rational support in the record'"; the administrator's decision will not be overturned "unless it is 'downright unreasonable.'" *Davis*, at 576 (quoting *Leipzig v. AIG Life Insurance Co.*, 362 F.3d 406, 409 (7th Cir. 2004) and *Sisto v. Ameritech Sickness & Accident Disability Benefit Plan*, 429 F.3d 698, 700 (7th Cir. 2005)). Thus, the question before the Court is whether there is rational support in the record for UnumProvident's determination that Ms. Jones did not "meet the definition of disability as outlined in the policy" because she "continued to work and [was] able to perform all the important duties of [her] own occupation up until the time of [her] termination." *See* October 17, 2003 Letter from Gail S. Lawson of UnumProvident to Louise Jones (attached to M&R's Appendix at pp. PRLCL00069-70).

M&R's employee benefit plan includes, among other documents, a Long-Term Disability Policy, which, as its name suggests, provides long-term disability coverage to two classes of employees, officers and managers of M&R (class 1 employees) and non-management salaried and hourly employees (class 2 employees). Ms. Jones qualified for coverage as a class 2 employee. Under the long-term disability policy, a class 2 employee is entitled to "monthly disability benefits" (which are paid according to a schedule included in the policy) if she is "totally disabled,"

11

meaning that

> during the Elimination Period and the first 24 months after completing the Elimination Period, the Employee:
>
> 1. is unable to perform the important duties of [her] own occupation on a Full-time or part-time basis because of an injury or Sickness that started while insured under this Policy; and
>
> 2. does not work at all; and
>
> 3. is under Doctor's Care.

Exhibit C, p. PD82000 (Section 2, 93-8). Under the policy, benefits "begin to accrue on the first day after the Employee completes the Elimination Period shown in the Schedule of Benefits" and are "paid monthly while the Employee is Disabled." *Id.*, p. PD82100 (Section 2, 93-8). According to the Schedule of Benefits, Ms. Jones' Elimination Period was 90 days. *See* Exhibit C, p. PD8-SOB.

The policy further provides that coverage under the policy terminates on the earliest of:

> 1. the date this Policy terminates;
>
> 2. the first day for which the Employee fails or refuses to make any required premium payment;
>
> 3. the first day for which premium on behalf of the Employee is not made;
>
> 4. the date the Employee no longer works in an eligible class; or
>
> 5. the date the Employee no longer works for the Employer.

12

*See* Exhibit C, p. PD81600, Section 1, 93-8. The policy provides, however, that "[t]ermination of insurance will not affect any claim incurred before the date of termination." *Id.*

As explained above, UnumProvident denied Ms. Jones' claim for benefits because it found that she did not meet the definition of disability as outlined in the policy. Specifically, UnumProvident said as follows:

> Based upon the information contained in your file it appears that, although you had been receiving treatment prior to your date of termination, August 7, 2002, you continued to work and you were able to perform all the important duties of your own occupation up until the time of your termination.

October 17, 2003 Letter from Gail S. Lawson of UnumProvident to Louise Jones (attached to M&R's Appendix at p. PRLCL00070).

If UnumProvident had denied Ms. Jones' claim for benefits on the basis of the "important duties" element alone, the Court might be inclined to agree with Ms. Jones that the denial was unreasonable. The parties have said little about what the "important duties" of Ms. Jones' Senior Buyer job were. But, as a threshold matter, showing up for work on a regular basis would seem to be among the most important duties of the job. And, if that were the case, then clearly, at least as of August 7, 2002, Ms. Jones was falling short of the mark – indeed, M&R concedes that it fired her because of excessive absenteeism caused by her

13

disability; she missed 22 days of work during the period from December 2001 to August 7, 2002. But UnumProvident did not deny benefits solely because Ms. Jones was managing to perform the "important duties" of her job.

To qualify for long-term disability benefits under M&R's employee benefit plan, Ms. Jones had to be "totally disabled" – meaning that, for the 90-day "Elimination Period," she was not only unable to perform the important duties of her job, but she was not working at all. Based on the undisputed record, Ms. Jones cannot satisfy this element of the Plan's total disability definition – by all accounts, she worked - even if sporadically – up until the time the company fired her on August 7, 2002. It is undisputed that Ms. Jones missed 22 days of work between December 2001 and August 7, 2002. Even allowing for a generous holiday schedule, Ms. Jones would have worked considerably more days than she missed.

Ms. Jones argues that the fact that she worked should not be held against her. And she cites *Hawkins v. First Union Corporation Long-Term Disability Plan*, 326 F.3d 914 (7th Cir. 2003), to support her argument. In *Hawkins*, Judge Posner criticized an ERISA plan's argument that an employee who works cannot be disabled, noting that "[t]his would be correct were there a logical incompatibility between working full time, and

being disabled from working full time, but there is not."
*Hawkins*, 326 F.3d at 918. Judge Posner recognized that "[a] desperate person might force himself to work despite an illness that everyone agreed was totally disabling" and that, as a matter of policy, "[a] disabled person should not be punished for heroic efforts to work by being held to have forfeited his entitlement to disability benefits should he stop working." *Id*.

As a general proposition, Judge Posner's words make sense. But, as Judge Posner has also noted, "[a]n ERISA plan is a contract." *Herzberger*, 205 F.3d at 330 (citations omitted). And, in this case, the contract clearly and expressly made not working at all a prerequisite to a finding of total disability, just as it clearly and expressly made a finding of total disability a prerequisite to a finding of eligibility to receive long-term disability benefits. That was not the case in *Hawkins*. Thus, while it may be true that working does not, by itself, prevent a finding of disabled, where the parties have contractually agreed that that is the case, the Court cannot simply undo or ignore that agreement. Because of this, what was deemed to be a "bad argument" in *Hawkins*, turns out to be a prevailing argument in this case.

Under the plain language of M&R's employee benefit plan, an employee is eligible for long-term disability benefits only if

she is "totally disabled" for a period of 90 days, and an employee is "totally disabled" only if she is unable to perform the important functions of her job, she does not work at all, and she is under a doctor's care. Based on the record before the Court, even if Ms. Jones could satisfy the first and last criteria, she could not satisfy the second. Accordingly, the Court cannot say that it was unreasonable for UnumProvident to determine that Ms. Jones did not meet the plan's "total disability" definition.

## Conclusion

For the reasons explained above, the Court finds that UnumProvident's decision to deny Ms. Jones long-term disability benefits is supported in the record and is not "downright unreasonable"; in short, it is not arbitrary and capricious. Accordingly, the Court denies Ms. Jones' motion for summary judgment [#28], and grants M&R's motion for summary judgment [#23].

Dated: June 15, 2006

ENTER:

_____
ARLANDER KEYS
United States Magistrate Judge